

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2004 DEC 20  AM 9:01

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MGE UPS SYSTEMS, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4-04CV-929-A |
| | § | |
| POWER MAINTENANCE | § | JURY DEMAND |
| INTERNATIONAL, INC., GENERAL | § | |
| ELECTRIC COMPANY, GE INDUSTRIAL | § | |
| SYSTEMS, INC., GE CONSUMER & | § | |
| INDUSTRIAL, INC., POWER | § | |
| PROTECTION SERVICES, LLC and BILL | § | |
| WILKIE, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Pursuant to FED. R. CIV. P. 15, which authorizes a party to amend its complaint at any time before a responsive pleading is filed, without leave of court, plaintiff MGE UPS Systems, Inc. ("MGE"), files this First Amended Complaint against defendants Power Maintenance International, Inc. ("PMI"), General Electric Company ("GE"), GE Industrial Systems, Inc. ("GEIS"), GE Consumer & Industrial, Inc. ("GECI"), Power Protection Services ("PPS") and Bill Wilkie. For purposes of simplicity, MGE shall refer to PMI, GE, GEIS and GECI as the "GE Defendants" or "PMI/GE" and to Wilkie and PPS as the "PPS Defendants." For its claims against the GE Defendants and the PPS Defendants, MGE would show the Court as follows:

# I.
## INTRODUCTION

1.     This is one of three copyright infringement actions pending against 23 different defendants in different jurisdictions.

a.      The related actions include *MGE v. Fakouri Electrical Engineering, Inc., et. al.,* No. 4-04CV-445-Y, pending in the United States District Court for the Northern District of Texas, Fort Worth Division, the Honorable Terry R. Means presiding ("Fort Worth Litigation"), and *MGE UPS Systems, Inc. v. Titan Specialized Services, Inc.,* No. 3-04-0231, pending in the United States District Court for the Middle District of Tennessee, Nashville Division, Chief Robert L. Judge Echols presiding ("Nashville Litigation").

b.      Chief Judge Echols, in Nashville, and Judge Means, in Fort Worth, have issued preliminary injunctions and impoundment orders against the 17 different defendants in those actions authorizing the United States Marshal's Office to use whatever force necessary to collect the infringing software and trade secrets misappropriated by the various defendants. To date, the United States Marshal's Offices in Tennessee and Fort Worth have collected 15 laptops and 28 CDs, all containing MGE's software and trade secrets.

c.      At this time, the only known parties with the software who are not subject to a preliminary injunction and impoundment order are the defendants named herein. MGE has been in negotiations with the GE Defendants for 17 months and with the PPS Defendants for nearly six months. Those negotiations have failed and MGE is now forced to initiate this litigation to obtain judicial resolution of this matter.

2.      This copyright infringement action includes RICO and unfair business practice allegations against a number of defendants. The software at issue is used to provide service and maintenance to critical power supplies that provide clean, uninterruptible power to the White House, the Pentagon, NASA, the nation's largest banks, the semiconductor industry, defense contractors, law firms, accounting firms, domestic and international government installations,

airport security, as well as apartment complexes, shopping malls and even some personal residences.

3.      In addition to trouble shooting and servicing MGE-manufactured UPS systems, the software, if used maliciously, could be applied to turn off power and/or transmit a power surge to the connected electrical components, causing them to malfunction or fail altogether.

4.      In this action, MGE seeks to prevent the future infringement and distribution of its registered software code and valuable trade secrets, and require the collection and impoundment of all copies of the infringing software in the possession of the defendants, including the computers, CD-ROMs, tapes and other media that have the software copied thereon pending a trial on the merits.   Many different public interests would be served by limiting the further distribution of MGE's software, including preserving the health and safety of the general public that relies on uninterruptible power supplies for their daily activities.

5.      The copyright infringement herein is pervasive and plaintiff is seeking immediate injunctive relief.  Motions for preliminary injunction and for expedited discovery are being filed separately.

## II.
### PARTIES

6.      MGE is a California corporation and has its principal place of business at 1660 Scenic Avenue, Costa Mesa, CA 92626.

7.      PPS is a Texas limited liability corporation with a principal place of business at 1307 Mackie Drive, Richardson, Texas 75081.  Process may be served on PPS' registered agent, Michael Stephens at 1307 Mackie Drive, Richardson, Texas 75081.

8.      Wilkie is a citizen and resident of Texas.  He may be served with process at 215 North Ebrite Street, Mesquite, Texas 75149.

9.     PMI is a Texas corporation with a principal place of business at 2500 Discovery Blvd., Rockwall, Texas 75032.  Process may be served on Michael Delgiacco, Secretary of PMI, at 2500 Discovery Blvd., Rockwall, Texas 75032.

10.    GE is a New York corporation with its principal place of business in New York. It is registered to conduct business in this state and has a registered agent for service of process in Texas.  Process may be served on GE's registered agent in Texas, CT Corp System, 350 N. St. Paul Street, Dallas, Texas 75201.

11.    Upon information and belief, GEIS is a New York corporation with a principal place of business in Plainville, Connecticut.  Process may be served on GEIS' current President, Lloyd Trotter, at 41 Woodford Avenue, Plainville, CT 06062.

12.    Upon information and belief, GECI is a New York corporation with a principal place of business at Appliance Park, AP3-232, Louisville, Kentucky 40225.  Process may be served on GECI's President and CEO Lloyd Trotter.

# III.
## JURISDICTION AND VENUE

13.    This is a copyright infringement action presented to the Court for decision under the Copyright Act, 17 U.S.C. §§ 101 et seq.

14.    Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

15.    Venue is proper under 28 U.S.C. §§ 1391 and 1400(a).

16.    The Court has personal jurisdiction over the defendants.

a.     The PPS Defendants and PMI, one of the four GE Defendants, are citizens of Texas, reside in this district and conduct and solicit business in this district.  A substantial part of the events giving rise to the claims occurred in this district, including acts of copyright infringement.  The Court, therefore, has personal jurisdiction over each Defendant.

b.    The Court has general jurisdiction over GE, GEIS and GECI because their contacts with this district are substantial and continuous.  The Court also has specific jurisdiction over the GE Defendants because (i) the GE Defendants have purposefully directed their activities to this district, have done business in this district, and purposefully availed themselves of the privilege of conducting activities within this district; (ii) some of the events which give rise to the claims asserted in this action occurred in this district and the effects of the GE Defendants' tortious conduct were felt in this district; and (iii) the exercise of jurisdiction comports with notions of fair play and substantial justice.

# IV.
## MATERIAL PREDICATE FACTS

***About MGE and Its Innovative Technology***

17.    MGE is a world leader in providing high-quality power solutions that increase power availability and system uptime to personal computers and enterprise-wide computer networks, mission-critical telecommunication systems, and industrial/manufacturing processes.

18.    Among other activities, MGE makes uninterruptible power supplies ("UPS") that are used in government installations such as the Pentagon, NASA and various airport security centers, as well as commercial institutions, like Citibank, Texas Instruments, law firms and other companies.  These organizations rely on MGE's UPS machines for an uninterruptible source of electrical power.

19.    MGE's comprehensive product offering includes UPS systems, inverters, rectifiers, power management software, active harmonic conditioners, and surge suppressors that provide MGE's customers with end-to-end infrastructure solutions.

20.    MGE has invested significant resources in research and development over three decades.  The core technology includes: (1) hardware that provides an uninterruptible power

source for government installations and commercial enterprises; (2) software code that allows for the expedited servicing of these devices; and (3) certain operating data and know how that constitutes trade secrets for the efficient servicing and maintenance of MGE-manufactured UPS systems.

21.　　MGE manufactures several UPS systems including, without limitation, the Galaxy and Comet models.  MGE sells, installs and services the Galaxy and Comet in the United States under the trade names EPS 3000 and EPS 6000, respectively.

22.　　MGE developed certain proprietary software to service the EPS 3000 and EPS 6000.  These software programs, known as "Muguet" and "Pacret," are registered with United States Copyright Office, as Registration Nos. TXu1-142-309, TXu1-142-310, TXu1-108-674, TXu1-108-675, TXu1-108-676, and TXu1-108-677 ("Protected Software").  Without the software, servicing an MGE-manufactured UPS can take three to six hours, or longer.  By using the software, servicing can be completed in one to three hours, or less.

　　　a.　　The software can be used to disable an MGE-manufactured power supply and "turn off" the power to a facility connected to the UPS.

　　　b.　　The software can also be used to create a power surge capable of destroying all electronic equipment powered by the UPS, such as hospital equipment, consumer electronics, and government operating systems.

　　　c.　　For public safety reasons, MGE does not permit access to its Protected Software unless a user has completed rigorous training courses and is fully qualified to use the software.  The individual must also execute a confidentiality agreement to preserve the confidential nature of the software and the trade secrets that permit its efficient application.

d.     Each program was written by MGE in standard programmer's code and assembled into an executable file for ease of use.  The code for both programs incorporates a security feature that searches for a hardware key or "dongle" connected to the computer's data port before fully launching.  If the dongle is not found, the software does not function.  As an additional security precaution, each dongle has an expiration date programmed within it.  After a specified period of time, typically up to one year, the dongle will stop functioning and the software will not fully launch.

23.     There are many different UPS systems on the market manufactured by different companies.  Sophisticated UPS systems include circuit boards with semiconductor chips that serve as the brain of the UPS system and control its operations.  The semiconductor chips used on these circuit boards include firmware, which is a type of software burned onto the chips and which controls their logic and the tasks that they perform.  For a variety of reasons, the circuit boards on most UPS devices need to be occasionally replaced to either repair the unit or allow for optimal performance.

24.     Changing a circuit board for any UPS, regardless of the manufacturer, can be a time-consuming and expensive process.  If a service technician does not have the correct board available for a specific unit, a new board may need to be ordered from the manufacturer. Alternatively, a service technician can cannibalize a board from an equivalent unit that has a functioning circuit board.

25.     MGE recognized the inefficiencies inherent in servicing UPS units in general and devised a system to reduce or eliminate those inefficiencies.  Recognizing that trouble shooting a UPS system was often a "trial and error" process, and that replacing internal circuit boards was expensive and inconvenient, MGE devised the Protected Software to communicate with its UPS

units to diagnose and troubleshoot an MGE-manufactured unit by automatically collecting data from the unit for display and analysis by the field service engineer.

26.     Because the software was engineered from the ground-up contemporaneously with the design of MGE's UPS devices, the software has the ability to directly access and modify the programming of the firmware software imbedded on the semiconductor chips residing on the circuit boards.  This allows an MGE service technician the ability to service a UPS system and avoid having to replace a circuit board in many instances.  This innovation is not available for UPS systems designed by other manufacturers.

27.     As a result of this innovation, servicing for MGE-manufactured devices has been reduced from three to six hours, on average, to one to three hours, or less.  Likewise, the need to completely replace a circuit board has been substantially reduced.  MGE's innovation saves the customer significant time and money.

28.     To MGE's knowledge, no other UPS manufacturer has been able to incorporate a software program capable of reducing the service time of a UPS.  For non-MGE manufactured UPS systems, service technicians must still physically replace malfunctioning circuit boards.

29.     Like many forms of innovation, MGE's software can be used for malicious purposes.  With just a few hours of training, or trial and error, a malicious user with access to the software can manipulate an MGE-manufactured UPS to shut down electrical power to those who rely upon it.  Furthermore, the software can cause the UPS to send a power surge to the components plugged in to the power stream, permanently damaging those electronic components.

30.     In addition to the software, MGE has, through the expertise and knowledge of its managers and engineers, and by experimentation, planning and strategy, developed a number of

trade secrets relating to the operation of its UPS systems. Some of the trade secrets are stored in electronic form on a CD-ROM data disk ("Data Disk") that is used by field engineers in the servicing of MGE UPS devices. The Data Disk is a supplemental resource used with the Protected Software to service MGE UPS devices. The information on the Data Disk is revised on an as-needed basis.

31.    The Protected Software and Data Disk are used to service UPS systems manufactured by MGE. The Protected Software and Data Disk, as a general rule, are not distributed or sold to third parties. On select and limited occasions, MGE has negotiated a written license agreement with third parties for the use of the Protected Software and access to the Data Disk. The terms of the agreements prohibit the sale or sublicensing of the Protected Software and Data Disk to any party without the express written consent of MGE.

32.    MGE's Protected Software is used with a collection of technical data that MGE protects as trade secrets. The technical data provides the optimum parameters for the most efficient operation of each individual unit. In the past, the trade secrets were stored on the Data Disk as digitized images on a CD-ROM and were entrusted to MGE-employed field engineers for the servicing of MGE-manufactured UPS systems. A different system is now employed to allow convenient distribution of information. The data is clearly marked as confidential proprietary data.

33.    The software and technical data are used together. Typically, the field engineer connects his laptop to the MGE UPS device, connects an MGE-assigned hardware key or dongle to the laptop and then runs the applicable software program (either Muguet or Pacret) to service the unit. Each software program searches for and collects data from the UPS system and displays the system settings and other information on the computer monitor for the user. After

obtaining the system settings and operating parameters provided from the software program, the field engineer may refer to the technical data on the Data Disk to either repair the machine or to reset the operating parameters for the unit so that it will perform at optimum efficiency. Any need to replace parts for the MGE unit also can be identified at that time. When used together, the Protected Software and technical data available from the Data Disk ensure the safest and most efficient operation of the UPS system, extending the life of the unit and saving significant servicing time.

34.     The technical data protected as MGE trade secrets has been available in two formats: hard copies available in large binders and in electronic form, either on CD-ROM or through databases that are accessible only to MGE employees. MGE preserves the trade secrets by limiting access to the information to trusted employees that need to use the information to perform their jobs such as field engineers, technical support personnel, managers or members of the research and development departments. MGE labels the Data Disks as confidential.

35.     MGE has taken and continues to maintain reasonable efforts to maintain the secrecy of its trade secrets, which include requiring employees to enter into confidentiality and non-disclosure agreements. MGE tracks the dissemination and disposition of all of its Protected Software and dongles using its Asset Tracking Database. Technical information is currently distributed to its service technicians using an electronic database, access to which is strictly controlled. MGE's trade secrets are not known, nor are they readily available outside of MGE. The trade secrets are known by, and available to, only certain of MGE's key employees and/or qualified and approved contractors who have a unique need for the information and who have negotiated a formal written agreement in advance. MGE continues to invest in the protection of its intellectual property and trade secrets, as evidenced by the migration of all maintenance

software to Windows-based applications.  These Windows-based applications generate unique codes that are registered with an MGE controlling authority who then issues authorization codes that allow the software to operate only on the computer on which the software was originally installed.  These authorization codes also limit the duration during which the software will operate.

### The Software is Hacked and an Underground Network Emerges

36.    A man named David White, a native of Nashville Tennessee, was employed as a field engineer for MGE during much of the 1990s.  During this time, White serviced MGE UPS devices for MGE customers and used MGE's Protected Software and Data Disk when performing the duties of his employment.

37.    White resigned his employment with MGE in approximately January 1999.  After leaving MGE, White, without authorization, knowingly obtained illegal copies of MGE's Protected Software and Data Disk from David Bergman, another former MGE employee.

38.    White founded Titan Specialized Services, Inc. "(Titan")" on or about December 10, 1998 and, through Titan, serviced MGE EPS 3000 and 6000 UPS's using the Protected Software and Data Disk.

39.    For a period of years, and until enjoined by Chief Judge Echols in the Nashville Litigation, White and Titan used the Protected Software and Data Disk and profited from that conduct.

40.    Through the employment of a private investigator, MGE learned that White had hacked the software to remove the software code lines that required the use of a hardware dongle to fully launch the software.  White and/or his accomplice, Bergman, decompiled the MGE executable software code, searched for the dongle code lines, deleted them, then recompiled the

code into executable code that could be used to launch the software. The hacked version of the software no longer required the hardware dongle employed as a security feature.

41.    MGE's private investigator purchased a hacked version of the code from White for $5,000. MGE then initiated litigation against White, who eventually admitted that he had sold the software to at least ten other individuals. He further testified that he had heard that the GE Defendants had obtained the hacked software, albeit not through him.

42.    During his deposition, White testified that an "underground network" of field engineers existed that exchanged software and trade secrets, including MGE's Protected Software and Data Disk. The purpose of the underground network was to share and exchange knowledge regarding MGE's product lines, and other UPS systems, and to profit from servicing those systems.

### JT Packard's Involvement in the Proliferation of the Hacked Software

43.    JT Packard, one of the members of the underground network, and a defendant in the Nashville Litigation, acquired an unauthorized copy of the Protected Software and the Data Disk from White in exchange for a credit on batteries. JT Packard knew the software was unlicensed at the time. After selling the Protected Software and Data Disk, White trained JT Packard employees on how to use the Protected Software and Data Disk at a customer's site in Wisconsin.

44.    JT Packard distributed unauthorized copies of the Protected Software and the Data Disk to all of its field engineers in approximately October 2003. In an email message dated October 5, 2003, JT Packard employee Tighe Robey said that "You either have received, or will be receiving, a CD ROM that contains the necessary software for configuration of the

Powerware and MGE UPS systems." The email was addressed to twenty-five different JT Packard employees.

45. Until recently enjoined by Judge Echols in the Nashville Litigation, JT Packard used the Protected Software and Data Disk without permission from MGE in a competitive market. MGE was damaged as a result of this conduct.

46. As noted more fully below, defendant Wilkie was an employee at JT Packard in 2003. While at JT Packard, Wilkie obtained a copy of the MGE software. He eventually left JT Packard and joined defendant PPS, taking the software with him.

*About the GE Defendants*

47. Upon information and belief, GE, acting by and through its wholly-owned subsidiary GEIS, acquired PMI in July of 2001. Thereafter, GE operated PMI as part of its Digital Energy business. PMI's activities have been and continue to be conducted from, among other places, PMI's offices located in Rockwall, Texas.

48. Upon information and belief, in January of 2004, GE created its Consumer & Industrial business via a merger of GE Consumer Products with GE Industrial Systems. The new entity, GE Consumer & Industrial, is under the direction of President and CEO Lloyd Trotter. GE, by and through one or more of its divisions, subsidiaries or affiliates, obtained one or more unauthorized copies of MGE's Protected Software and/or Data Disk.

49. Following GE's acquisition of PMI, MGE began receiving a number of unsubstantiated reports of infringement of MGE's Protected Software and Data Disk by competitors. At or about the same time that MGE first learned of rumors that PMI and/or GE were infringing MGE's Protected Software, MGE began losing a number of important accounts with organizations that used MGE-manufactured units. Shortly thereafter, GE contacted MGE

and initiated negotiations to obtain an unprecedented five hundred (500) licenses to use MGE's Protected Software. Upon information and belief, GE's request for 500 licenses was nothing more than a back-door attempt to legitimize its previous illegal use of the Protected Software.

50.     A former PMI/GE employee, Thomas Daly, stepped forward to report the GE Defendants' infringement. Daly had objected to the use of MGE's software to a person serving in the role of ethics officer at PMI/GE. Daly's objection was ignored and, shortly after reporting the incident, Daly was terminated from PMI/GE.

51.     After his termination, Daly reported the infringement to the FBI, who instructed him to report the conduct to MGE. Daly then contacted MGE and reported that he had personally witnessed the use of MGE's Protected Software by PMI/GE. Specifically, Mr. Daly informed MGE that GE had obtained and was using an unauthorized copy of MGE's Protected Software and Data Disk to provide service to MGE-manufactured UPS devices in competition with MGE. Based upon the information obtained from Mr. Daly, MGE sent PMI/GE a cease and desist letter in July 2003. PMI/GE responded by denying any infringing activity had occurred.

52.     After PMI/GE responded to MGE's cease and desist letter, yet another third-party witness, Steve Evans, approached MGE and reported that PMI/GE employees had the Protected Software. Mr. Evans further explained that shortly after MGE confronted PMI/GE regarding the infringement, PMI/GE dispatched one or more employees to multiple sites to collect and destroy evidence of its unlawful activity.

53.     For more than seventeen (17) months, MGE attempted to negotiate a resolution of this dispute with PMI/GE. Those negotiations failed.

54.    As part of the negotiations, MGE has demanded that PMI/GE return all MGE property, including the Protected Software and Data Disk. PMI/GE have failed and refused to return to MGE all copies of the Protected Software and Data Disks in their possession.

***Defendants PPS and Wilkie***

55.    In June and July of 2004, defendant Wilkie contacted MGE and admitted having MGE's Protected Software. Wilkie also represented to MGE that he held part ownership in PPS.

56.    As noted above, defendant Wilkie had access to MGE's Protected Software and Data Disk during his employment with JT Packard, and took the Protected Software and Data Disk from JT Packard at the end of his employment. PPS has obtained unauthorized access to MGE's Protected Software and Data Disk through Defendant Wilkie.

57.    Defendants Wilkie and PPS requested an opportunity to negotiate settlement terms with MGE. MGE entered into settlement negotiations with Wilkie and PPS for six (6) months. Despite repeated efforts to resolve the dispute, the settlement negotiations failed. Wilkie and PPS have refused to turn over the copies of MGE's Protected Software and Data Disk in their possession despite repeated requests from MGE.

***No License Granted to These Defendants***

58.    None of the defendants herein have a license to use the Protected Software or the Data Disk.

***Facts Relating to RICO Claims***

59.    The GE Defendants, Wilkie, PPS and others participated in an informal enterprise where engineers exchanged proprietary software and confidential information in an effort to breed competition against MGE and others. Defendant Wilkie admitted that he obtained the Protected Software from JT Packard, who in turn purchased the software from White. White has

admitted that the group is an "underground network" that has exchanged illegal copies of the Protected Software, the Data Disk, and other technical know-how protected as MGE trade secrets.

60.    The "underground network" uses a hacked version of the Protected Software that does not require a dongle.  A former employee of PMI/GE has testified that PMI/GE are using MGE's Protected Software without a dongle.  Consistent with this information, David White indicated in his deposition that PMI/GE had obtained the software.  Thus, MGE reasonably believes that PMI/GE Defendants obtained one or more copies of the hacked software through the underground network described by White.

61.    The actions of this "underground network" include the following: Unauthorized copying and sharing of MGE's proprietary software information; multiple infringements of the Protected Software; unauthorized sharing and disclosure of MGE's confidential technical data; exchanging confidential, proprietary information and trade secrets of MGE and possibly others.

62.    The parties involved in this "underground network" are aware that their conduct involves copyright infringement and misappropriation of trade secrets.

## Count One:
### CLAIM FOR COPYRIGHT INFRINGEMENT AGAINST WILKIE AND PPS

63.    Defendant Wilkie had access to MGE's Protected Software and Data Disk during his employment with JT Packard, and took the Protected Software and Data Disk from JT Packard at the end of his employment.  PPS has obtained unauthorized access to MGE's Protected Software and Data Disk through Defendant Wilkie.

64.    Defendants Wilkie and PPS have used, copied, made derivative works of, sold and/or otherwise distributed unauthorized copies of MGE's Protected Software in violation of 17 U.S.C. § 501 et seq.

65.     Pursuant to 17 U.S.C. § 502, MGE is entitled to an injunction against Defendants Wilkie and PPS preventing further infringement of the Protected Software.

66.     Pursuant to 17 U.S.C. § 503, MGE is entitled to an order against Wilkie and PPS impounding and destroying all unauthorized copies of the Protected Software and all devices, including computer equipment, that include copies of the Protected Software.

67.     MGE is entitled to damages and profits through 17 U.S.C. § 504 including, without limitation, statutory damages, actual damages and profits.

68.     MGE is entitled to costs and attorneys' fees pursuant to 17 U.S.C. § 505.

69.     MGE is entitled to an order requiring seizure and forfeiture of all infringing articles pursuant to 17 U.S.C. § 509.

70.     MGE is entitled to all other relief available under the copyright statute and common law for copyright infringement, including enhanced damages.

## Count Two:
### RICO CLAIM AGAINST DEFENDANTS PPS AND WILKIE

71.     Defendants Wilkie and PPS have engaged in a pattern of racketeering with the named defendants in the Nashville litigation through repeatedly copying and using MGE's Protected Software, and distributing and disclosing confidential and proprietary information regarding the Protected Software to one another through an informed enterprise that White called "underground network," thereby infringing MGE's copyright in the Protected Software and criminally violating the Copyright statute.

72.     The members of the "underground network" that White identified in a sworn deposition is an association of entities and individuals that provide services to the public and can be construed as a trade group. Their ongoing, coordinated behavior, including corporations and individuals, which includes the infringement of MGE's registered copyrights, constitutes an

enterprise because all of the members' conduct through the "underground network" comprises an association-in-fact among the members and the other entities and individuals. Defendants Wilkie and PPS are members of this underground network.

73. There is a nexus between the pattern of racketeering of Defendants' activities and the enterprise because Defendants directly receive MGE's confidential and proprietary information, material and products, without authorization, by way of their involvement with the enterprise, and likewise distribute without authorization MGE's confidential and proprietary information, material and products to others involved in the enterprise.

74. The racketeering activities of Defendants and the other members of the underground network have caused injury to MGE's business. Defendants are benefiting from their unauthorized business activities to the detriment and injury of MGE, while MGE's competitive advantage in the UPS business market place is being substantially eroded. Further, Defendants are reaping pure profit from a service system on which they spent no money to develop or protect. Finally, Defendants' conduct is damaging MGE's business relationships with its customers.

## Count Three:
### MISAPPROPRIATION OF TRADE SECRETS IN DATA DISK AGAINST DEFENDANTS WILKIE AND PPS

75. MGE has developed through the expertise and knowledge of its managers and engineers, and by experimentation, planning, and strategy, a number of trade secrets relating to its operation of UPS systems. MGE's confidential and proprietary information relating to the development and operation of its UPS systems was created through years of effort, planning and strategy, and extensive engineering analysis. Indeed, MGE possesses unique pecuniary interests in the development and operation of its UPS systems created over time through expenditures of

considerable labor, skill and money.  Further, MGE has spent millions of dollars and thousands of man-hours to develop, refine, and implement its core technology.

76.     MGE's trade secrets are not known, nor readily available outside of MGE, and are known by and available only to certain of MGE's key employees and/or qualified and approved contractors who have a unique need for the information and who have negotiated a formal written agreement in advance.  Indeed, MGE has taken and continues to maintain reasonable efforts to maintain the secrecy of its trade secrets.  This information is valuable to MGE's competitors and is not easily duplicated.  Such information also provides a competitive advantage to MGE.

77.     Some of MGE's trade secrets are electronically stored on a Data Disk available only on an as-needed basis to MGE qualified employees and field engineers.  Defendants had access to MGE's trade secrets through their use of unauthorized copies of the Data Disk. Defendants know or reasonably should have known that through their unauthorized use of MGE's Data Disk each was acquiring confidential MGE trade secrets.  Defendants have used and/or disclosed MGE's trade secrets contained on the Data Disk in competition with MGE and thereby have obtained a special advantage in that competition.

78.     MGE has suffered damages in excess of the minimal jurisdictional limits of this Court as a result of Defendants' misappropriation of trade secrets.  Additionally, MGE has been proximately injured by this misappropriation because its competitive advantage in the UPS business market place has been substantially eroded.

## Count Four:
### CONVERSION OF THE DATA DISK
### AGAINST DEFENDANTS WILKIE AND PPS

79.      Defendants are currently in possession of MGE's information and property, including but not limited to the Data Disk.  Demand has been made upon Defendants Wilkie and PPS for the return of all MGE information and property Defendant PPS acquired through Wilkie. Defendants have failed to return MGE's information and property and, upon information and belief, are using some or all of that information and property in direct competition with MGE.

80.      Defendants' conversion of MGE's property has caused damages to Plaintiff in excess of the minimal jurisdiction limits of this Court.

## Count Five:
### UNFAIR COMPETITION AGAINST
### DEFENDANTS WILKIE AND PPS

81.      The foregoing acts of Defendants Wilkie and PPS constitute unfair competition and unjust enrichment in their unauthorized use of MGE's trade secrets and confidential proprietary information through the appropriation of the Data Disk and the Protected Software which has enhanced and benefited Defendants' business activities to MGE's detriment and injury.

82.      Defendants have embarked upon a deliberate scheme to acquire and have acquired the means and ability to compete with MGE either solely or in collaboration with others through the acquisition, use and distribution of the Protected Software and Data Disk.  In so doing, Defendants sought to benefit and have unfairly benefited from the wrongful actions set forth herein.  MGE has a vested interest in a property right worthy of protection to keep its trade secret and confidential information private.    Wilkie acquired confidential and trade secret information as a result of his previous employment with JT Packard.  Defendants have profited at

the expense of MGE without consent, justification, privilege or excuse, and have wrongfully received the benefits of MGE's time, effort, labor and expense to which they are not entitled.

83.     Defendants' conduct has caused MGE damages in excess of the minimal jurisdictional limits of this Court.

**Count Six:**
**CLAIM FOR COPYRIGHT INFRINGEMENT AGAINST**
**PMI AND THE GE DEFENDANTS**

84.     Thomas Daly, a former PMI/GE employee, has testified that he personally observed PMI/GE employees using a hacked version of MGE's Protected Software while servicing an MGE-manufactured UPS on the MCI/WorldCom premises on or about April 19, 2001.

85.     A second witness, Steven E. Evans, has testified that a PMI/GE employee admitted that PMI/GE was using MGE's Protected Software to service MGE-manufactured UPS devices.  According to the PMI/GE employee, some, but not all, of the software was destroyed after MGE confronted PMI/GE regarding the infringement.

86.     Based on the sworn testimony of Daly and Evans, MGE reasonably believes and hereby alleges that PMI/GE have used, copied, made derivative works of, sold and/or otherwise distributed unauthorized copies of MGE's Protected Software in violation of 17 U.S.C. § 501 et seq.

87.     Pursuant to 17 U.S.C. § 502, MGE is entitled to an injunction against PMI and the GE Defendants preventing further infringement of the Protected Software.

88.     Pursuant to 17 U.S.C. § 503, MGE is entitled to an order against PMI and the GE Defendants impounding and destroying all unauthorized copies of the Protected Software and all devices, including computer equipment, that include copies of the Protected Software.

89.     MGE is entitled to damages and profits through 17 U.S.C. § 504 including, without limitation, statutory damages, actual damages and profits.

90.     MGE is entitled to costs and attorneys' fees pursuant to 17 U.S.C. § 505.

91.     MGE is entitled to an order requiring seizure and forfeiture of all infringing articles pursuant to 17 U.S.C. § 509.

92.     MGE is entitled to all other relief available under the copyright statute and common law for copyright infringement, including enhanced damages.

## Count Seven:
### RICO CLAIM AGAINST PMI
#### AND THE GE DEFENDANTS

93.     Based on the testimony of Thomas Daly that PMI/GE is using a hacked version of the Protected Software, MGE reasonably believes and hereby alleges that PMI/GE obtained illegal copies of the software through the underground network through which at least twelve other infringers obtained their copies of the Protected Software.

94.     The members of the "underground network" that White identified in a sworn deposition is an association of entities and individuals that provide services to the public and can be construed as a trade group. Their ongoing, coordinated behavior, including corporations and individuals, which includes the infringement of MGE's registered copyrights, constitutes an enterprise because all of the members' conduct through the "underground network" comprises an association-in-fact among the members and the other entities and individuals. Based on the testimony of White, Evans, and Daly, MGE reasonably believes and hereby alleges that PMI and the GE Defendants are members of this underground network.

95.     There is a nexus between the pattern of racketeering of defendants' activities and the enterprise because defendants directly receive MGE's confidential and proprietary

information, material and products, without authorization, by way of their involvement with the enterprise, and likewise distribute without authorization MGE's confidential and proprietary information, material and products to others involved in the enterprise.

96.     The racketeering activities of defendants and the other members of the underground network have caused injury to MGE's business. Defendants are benefiting from their unauthorized business activities to the detriment and injury of MGE, while MGE's competitive advantage in the UPS business market place is being substantially eroded. Further, defendants are reaping pure profit from a service system on which they spent no money to develop or protect. Finally, defendants' conduct is damaging MGE's business relationships with its customers.

## Count Eight:
### MISAPPROPRIATION OF TRADE SECRETS IN DATA DISK AGAINST PMI AND THE GE DEFENDANTS

97.     MGE has developed through the expertise and knowledge of its managers and engineers, and by experimentation, planning, and strategy, a number of trade secrets relating to its operation of UPS systems. MGE's confidential and proprietary information relating to the development and operation of its UPS systems was created through years of effort, planning and strategy, and extensive engineering analysis. Indeed, MGE possesses unique pecuniary interests in the development and operation of its UPS systems created over time through expenditures of considerable labor, skill and money. Further, MGE has spent millions of dollars and thousands of man-hours to develop, refine, and implement its core technology.

98.     MGE's trade secrets are not known, nor readily available outside of MGE, and are known by and available only to certain of MGE's key employees and/or qualified and approved contractors who have a unique need for the information and who have negotiated a formal

written agreement in advance. Indeed, MGE has taken and continues to maintain reasonable efforts to maintain the secrecy of its trade secrets. This information is valuable to MGE's competitors and is not easily duplicated. Such information also provides a competitive advantage to MGE.

99.    Some of MGE's trade secrets are electronically stored on a Data Disk available only on as-needed basis to MGE qualified employees and field engineers. PMI and the GE Defendants had access to MGE's trade secrets through their use of unauthorized copies of the Data Disk. Defendants knew or reasonably should have known that through their unauthorized use of MGE's Data Disk each was acquiring confidential MGE trade secrets. PMI and the GE Defendants have used and/or disclosed MGE's trade secrets contained on the Data Disk in competition with MGE and thereby have obtained a special advantage in that competition.

100.   MGE has suffered damages in excess of the minimal jurisdictional limits of this Court as a result of PMI and the GE Defendants' misappropriation of trade secrets. Additionally, MGE has been proximately injured by this misappropriation because its competitive advantage in the UPS business market place has been substantially eroded.

## Count Nine:
### CONVERSION OF THE DATA DISK
### AGAINST PMI AND THE GE DEFENDANTS

101.   PMI and the GE Defendants are currently in possession of MGE's information and property, including but not limited to the Data Disk. Demand has been made upon PMI/GE for the return of all MGE information and property. Defendants have failed to return MGE's information and property and, upon information and belief, are using some or all of that information and property in direct competition with MGE.

102. PMI and the GE Defendants' conversion of MGE's property has caused damages to MGE in excess of the minimal jurisdiction limits of this Court.

## Count Ten:
### UNFAIR COMPETITION AGAINST PMI AND THE GE DEFENDANTS

103. The foregoing acts of Defendants PMI/GE constitute unfair competition and unjust enrichment in their unauthorized use of MGE's trade secrets and confidential proprietary information through the appropriation of the Data Disk and the Protected Software which has enhanced and benefited PMI and the GE Defendants' business activities to MGE's detriment and injury.

104. PMI and the GE Defendants have embarked upon a deliberate scheme to acquire and have acquired the means and ability to compete with MGE either solely or in collaboration with others through the acquisition of the Protected Software and Data Disk. In so doing, PMI and the GE Defendants sought to benefit and have unfairly benefited from the wrongful actions set forth herein. MGE has a vested interest in a property right worthy of protection to keep its trade secret and confidential information private. PMI and the GE Defendants have profited at the expense of MGE without consent, justification, privilege or excuse, and have wrongfully received the benefits of MGE's time, effort, labor and expense to which they are not entitled.

105. PMI and the GE Defendants' conduct has caused MGE damages in excess of the minimal jurisdictional limits of this Court.

## Count Eleven:
### DAMAGES

106. MGE has incurred damages for all the above conduct in an amount that is not calculable at this time but which MGE reasonably believes to be in the range of $104 Million to

$253 Million.  This damages calculation will be revised as discovery commences and may need to be adjusted upward or downward.

## Count Twelve:
### APPLICATION FOR PRELIMINARY INJUNCTION
### AGAINST DEFENDANTS PPS, WILKIE, PMI AND GE DEFENDANTS

107.   The actions of Defendants violate the laws concerning copyright infringement, RICO, misappropriation of trade secrets and/or confidential proprietary information, conversion, and unfair competition for which there is no adequate remedy at law.

108.   Plaintiff's Application for Preliminary Injunction Against Defendants ("Injunction Application") is supported by the Declaration of Rod Saunders, Senior Vice President of Services of MGE, Thomas J. Wilkowske, Manager of National Tech Support Team of MGE and Mark Schidler, Logistics Manager of MGE.  The declarations, which will be filed separately, set forth specific facts which show that the above facts are true, and that Defendants' wrongful conduct will result in immediate and irreparable harm to MGE.

109.   As will be set forth in the declarations to be filed separately, there is a substantial threat that MGE will suffer imminent, irreparable harm if a preliminary injunction is not granted to restrain Defendants' unlawful conduct, as more particularly described herein.  If Defendants are not enjoined from their unlawful conduct, they can and will continue to use, disclose and/or sell unauthorized copies of MGE's Protected Software in violation of 17 U S C § 501 et seq.

110.   Defendants' actions have caused and will continue to cause MGE irreparable harm.  Defendants' unauthorized use of MGE's trade secrets and confidential proprietary information, in direct competition with MGE, has enhanced and benefited Defendants' business activities to MGE's detriment and injury.  As a result, MGE's competitive advantage in the UPS

business marketplace has been substantially eroded as Defendants have gained a special advantage.

111.    Money damages are inadequate to remedy this harm because there is no way to measure the lost business relationships between MGE and its customers due to Defendants' unfair competitive maneuvers in the relevant, and relatively low-supply market, of UPS systems maintenance.  Defendants' unauthorized use of MGE Protected Software, creates a false perception in the market that MGE service and maintenance is more widely available, and at varying costs, than is actually true.  Defendants are benefiting from this misconception, as well as reaping pure profit from a service system on which they spent no money developing or protecting.  Through such unfair competition Defendants' have harmed, and are continuing to harm, MGE in an amount that is not susceptible to accurate calculation.

112.    There is a substantial likelihood that MGE will prevail on the merits because it has adduced evidence that:

a.    As to its copyright infringement claim, MGE is the rightful owner of the Protected Software and Data Disk and that Defendants have copied MGE's Protected Software and Data Disk.

b.    As to its RICO claim, Defendants are part of an associated enterprise who repeatedly infringe MGE's copyright in its Protected Software by disclosing confidential and proprietary information and distributing the Protected Software and Data Disk, to the injury of MGE's business interests.

c.    As to its misappropriation of trade secrets and/or proprietary information claim, MGE is the rightful owner of the Data Disk which contains confidential and proprietary information regarding the operating parameters of the UPS system that is secret, that Defendants

have obtained the trade secret and/or proprietary information through improper means because MGE does not license its Data Disk, and Defendants have utilized MGE's confidential information to their benefit and to MGE's detriment.

d.    As to its conversion claim, MGE is the rightful owner of the Data Disk which contains confidential and proprietary information regarding the operating parameters of the UPS system, and Defendants have converted MGE's confidential and proprietary information because they have unlawfully taken and/or retained possession and control of the property in defiance of MGE's rights.

e.    As to its unfair competition claim, Defendants' infringement, misappropriation and conversion of MGE's Protected Software and Data Disk have injured MGE's competitive advantage in the UPS business market place and deceived the public.

113.    The threatened imminent irreparable injury to MGE substantially outweighs the threatened harm, if any, to Defendants should MGE's request for injunctive relief be granted because Defendants' unauthorized use of MGE's trade secrets and confidential proprietary information, in direct competition with MGE, has enhanced and benefited Defendants' business activities to MGE's detriment and injury.  Granting MGE's request for injunctive relief will serve the public's interest because it will alleviate confusion in the marketplace as to the availability and pricing of service maintenance for MGE's UPS systems.  Granting the preliminary injunction will not substantially harm others.

114.    Pursuant to Federal Rule of Civil Procedure 65(a)(1), a preliminary injunction will not issue without notice to Defendants.

115.    MGE is willing to post reasonable security as a bond for the preliminary injunction requested.

116.    If Defendants are not restrained and enjoined from continuing their unlawful actions, as fully described herein, they will continue to use MGE's confidential and proprietary information for their own financial gain.    Because the confidential information embodied in MGE's trade secrets is a valuable asset created over time through expenditures of considerable labor, skill and money, absent an injunction, MGE's competitors will be able to obtain the advantages of MGE's efforts and expenses while further damaging MGE's business and reputation.    Under these circumstances, the law allows for the issuance of a preliminary injunction, and thereafter, a permanent injunction, to restrain and enjoin Defendants' unlawful conduct.

117.    MGE asks the Court to set its application for preliminary injunction for hearing at the earliest possible time, and after hearing the request, issue a preliminary injunction against Defendants.

## Count Thirteen:
### APPLICATION FOR PERMANENT INJUNCTION AGAINST DEFENDANTS

118.    MGE asks the Court to set its application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendants.

## V.
### JURY DEMAND

MGE demands trial by jury for all claims so triable.

## VI.
### PRAYER

WHEREFORE, MGE respectfully prays that this Court enter judgment against all Defendants as follows:

A.   Declaring that all Defendants have infringed MGE's copyright to the Muguet software in violation of 17 U.S.C. § 501 et seq.

B.   Declaring that all Defendants have infringed MGE's copyright to the Pacret software in violation of 17 U.S.C. § 501 et seq.

C.   Enjoining all Defendants from further infringement of the Protected Software pursuant to 17 U.S.C. § 502.

D.   Impounding all copies of the Protected Software in all Defendants' possession pursuant to 17 U.S.C. § 503.

E.   Requiring that all Defendants pay damages and/or profits pursuant to 17 U.S.C.§ 504.

F.   Requiring that all Defendants pay MGE's costs and attorneys' fees pursuant to 17 U.S.C. § 505.

G.   Seizing and requiring forfeiture of all infringing articles pursuant to 17 U.S.C.§ 509.

H.   Requiring that all Defendants pay MGE punitive damages.

I.   Requiring that all Defendants pay actual and punitive damages for misappropriating the Data Disk.

J.   All general damages.

K.   Special damages arising from Defendants' conduct including, but not limited to, lost profits, loss of good will, reliance damages, and incidental damages.

L.   Defendants' profits arising from their tortious acts.

M.   Costs.

N.   Pre-judgment interest.

O.    Post-judgment interest.

P.    Attorneys' fees.

Q.    That the Court will issue a preliminary injunction, requiring that Defendants shall:

i.    Not use or disclose MGE's trade secret and confidential proprietary information obtained through the unauthorized possession of MGE's Protected Software, Data Disks, or other means.

ii.    Physically return to MGE, through delivery to MGE's counsel of record, all Protected Software and Data Disks in its possession, custody or control.

iii.    Cease any attempt to sell or otherwise disseminate MGE's trade secret and confidential proprietary information.

iv.    Not alter, destroy, disseminate, copy or duplicate in any manner the Protected Software and Data Disks.

v.    Cease all actions that constitute RICO violations.

R.    That Defendants be cited to appear and answer herein and that upon hearing, a preliminary injunction issue enjoining Defendants as described above;

S.    That a permanent injunction be ordered upon final trial of this cause as described above; and

T.    Such other relief to which Plaintiff may show itself entitled.

Respectfully submitted,

By: _____

Stephen A. Kennedy
State Bar No. 11300425
Robert J. Garrey
State Bar No. 07703420
John Russell Holloway
State Bar No. 24025433
Shannon M. Zmud
State Bar No. 24047169
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, TX 75202
(214) 953-6000
(214) 953-5822 (Telecopier)

Albon O. Head, Jr.
State Bar No. 09325000
James D. Bradbury
State Bar No. 02814500
JACKSON WALKER L.L.P.
301 Commerce Street, Suite 2400
Fort Worth, Texas  76102
(817) 334-7200
(817) 334-7290 (Telecopier)

ATTORNEYS FOR PLAINTIFF
MGE UPS SYSTEMS, INC.

3758013v4 125249/00007